IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE R&G FINANCIAL CORPORATION SECURITIES LITIGATION | : : : : | MASTER FILE NO. 05 Civ. 4186 (JES) |
| This document relates to All Actions | : : : | |

## MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PROPOSED PLAN OF ALLOCATION

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Max W. Berger (MB-5010)
Steven B. Singer (SS-5212)
Eric T. Kanefsky (EK-3511)
1285 Avenue of the Americas
New York, New York 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

**BARRACK, RODOS & BACINE**
Leonard Barrack
M. Richard Komins
Jeffrey A. Barrack
Lisa M. Lamb
3300 Two Commerce Square
2001 Market Street
Philadelphia, Pennsylvania 19103
Tel: (215) 963-0600
Fax: (215) 963-0838

*Attorneys for Lead Plaintiffs, City of Philadelphia Board of Pensions and Retirement and General Retirement System of the City of Detroit, and Co-Lead Counsel for the Proposed Settlement Class*

# Table of Contents

**Page**

I.     INTRODUCTION ........................................................................................................... 1

II.    DESCRIPTION OF THE LITIGATION ....................................................................... 3

III.   THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS FOR SETTLEMENT PURPOSES ....... 6

    A.     The Standards of Rule 23(a) are Satisfied .......................................................... 6

        1.   The Members of the Settlement Class are so Numerous that Joinder of all Members is Impracticable ..................................................... 7

        2.   There are Numerous Questions of Law or Fact Common to the Members of the Settlement Class ...................................................... 7

        3.   Lead Plaintiffs' Claims Are Typical of the Claims of the Settlement Class ........................... 8

        4.   Lead Plaintiffs Have Fairly and Adequately Protected the Interests of the Settlement Class ............................................... 9

    B.     The Requirements of Rule 23(b)(3) Have Been Met ........................................ 10

IV.    THE NOTICE OF SETTLEMENT SATISFIES DUE PROCESS REQUIREMENTS AND IS REASONABLE ........................................... 11

V.     THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ................. 12

    A.     The Standard for Approval of a Class Action Settlement ................................ 12

    B.     The Settlement is Substantively Fair Under *Grinnell* ................................... 15

        1.   The Complexity, Expense and Likely Duration of the Litigation ........................... 15

        2.   The Reaction of the Settlement Class to the Settlement ......................... 16

        3.   The Stage of the Proceedings and Amount of Discovery Completed ..................... 16

        4.   The Risks of Establishing Liability and Damages and in Maintaining the Class Action Through Trial ......................... 17

        5.   Collectability and the Ability of Defendants to Withstand a Greater Judgment ....................................... 20

        6.   The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and in Light of All Risks of Litigation ......................... 21

    C.     The Proposed Settlement is the Product of Informed Arm's-Length Negotiations and is Presumptively Fair ...................................... 23

VI.    THE PROPOSED PLAN OF ALLOCATION IS FAIR AND REASONABLE ...................... 23

VII.   CONCLUSION ........................................................................................................... 25

## Table of Authorities

**Page(s)**

CASES

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997)...................................................................................................................10

*City of Detroit v. Grinnell Corp.,*
   495 F.2d 448 (2d Cir. 1974)................................................................................................passim

*Cromer Finance Ltd. v. Berger,*
   205 F.R.D. 113 (S.D.N.Y. 2001) ..............................................................................................10

*Doe v. Karadzic,*
   192 F.R.D. 133 (S.D.N.Y. 2000) ..............................................................................................19

*Eisen v. Carlisle & Jacquelin,*
   417 U.S. 156 (1974)...................................................................................................................11

*Greebel v. FTP Software, Inc.,*
   939 F. Supp. 57 (D. Mass. 1996) ..............................................................................................13

*In re "Agent Orange" Prod. Liab. Litig.,*
   611 F. Supp. 1396 (E.D.N.Y. 1985) .........................................................................................22

*In re Am. Bank Note Holographics, Inc. Sec. Litig.,*
   127 F. Supp. 2d 418 (S.D.N.Y. 2001).................................................................................18, 24

*In re Auction Houses Antitrust Litig.,*
   193 F.R.D. 162 (S.D.N.Y. 2000) ................................................................................................9

*In re Blech Sec. Litig.,*
   187 F.R.D. 97 (S.D.N.Y. 1999) ..................................................................................................7

*In re Charter Commc'ns, Inc. Sec. Litig.,*
   No 4:02-CV-1186 (CAS), 2005 WL 4045741 (E.D. Mo. June 30, 2005) ................................25

*In re Chase Manhattan Corp. Sec. Litig.,*
   No. 90 Civ. 6092 (LJF), 1992 WL 110743 (S.D.N.Y. May 13, 1992) ......................................9

*In re Deutsche Telekom AG Sec. Litig.,*
   229 F. Supp. 2d 277 (S.D.N.Y. 2002)........................................................................................7

*In re Drexel Burnham Lambert Group, Inc.,*
   960 F.2d 285 (2d Cir. 1992).........................................................................................................9

*In re Drexel Burnham Lambert Group Inc.,*
   130 B.R. 910 (S.D.N.Y. 1991).................................................................................................15

*In re EVCI Career Colleges Holding Corp. Sec. Litig.,*
   No. 05 Civ. 10240 (CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007) ...........................13, 21

*In re Global Crossing Sec. and ERISA Litig.,*
    225 F.R.D. 436 (S.D.N.Y. 2004) ..................................................................................passim

*In re Gulf Oil/Cities Serv. Tender Offer Litig.,*
    142 F.R.D. 588 (S.D.N.Y. 1992) ........................................................................................25

*In re Holocaust Victim Assets Litig.,*
    413 F.3d 183 (2d Cir. 2005).................................................................................................25

*In re Independent Energy Holdings PLC Sec. Litig.,*
    No. 00 Civ. 6689 (SAS), 2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) ..........................18

*In re Livent, Inc. Noteholders Sec. Litig.,*
    210 F.R.D. 512 (S.D.N.Y. 2002) ........................................................................................10

*In re Michael Milken & Assocs. Sec. Litig.,*
    150 F.R.D. 46 (S.D.N.Y. 1993) .....................................................................................14, 23

*In re NASDAQ Market-Makers Antitrust Litig.,*
    169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................................................11

*In re NASDAQ Market-Makers Antitrust Litig.,*
    187 F.R.D. 465 (S.D.N.Y. 1998) ..............................................................................13,19, 23

*In re NASDAQ Market-Makers Antitrust Litig.,*
    No. 94 Civ. 3996 (RWS), 1999 WL 395407 (S.D.N.Y. June 15, 1999) ..............................11

*In re NASDAQ Market-Makers Antitrust Litig.,*
    No. 94 Civ. 3996 (RWS), 2000 WL 37992 (S.D.N.Y. Jan. 18, 2000) .................................24

*In re Nortel Networks Corp. Sec. Litig.,*
    No. 01 Civ. 1855 (RMB), 2003 WL 22077464 (S.D.N.Y. Sept. 8, 2003) .............................8

*In re Oxford Health Plans,*
    191 F.R.D. 369 (S.D.N.Y. 2000) ..........................................................................................8

*In re PaineWebber Ltd. P'ships Litig.,*
    171 F.R.D. 104 (S.D.N.Y. 1997) ...............................................................................9, 21, 23

*In re Prudential Ins. Co. Am. Sales Practice Litig.,*
    148 F.3d 283 (3d Cir. 1998) ................................................................................................15

*In re Sumitomo Copper Litig.,*
    189 F.R.D. 274 (S.D.N.Y. 1999) ..................................................................................passim

*In re Union Carbide Corp. Consumer Prod. Bus. Sec. Litig.,*
    718 F. Supp. 1099 (S.D.N.Y. 1989).....................................................................................23

*In re Versatility, Inc. Sec. Litig.,*
    No. 98 Civ. 1676 (JES) (Nov. 13, 1998).............................................................................17

*In re Vivendi Universal, S.A.,*
    242 F.R.D. 76 (S.D.N.Y. 2007) ............................................................................................8

*In re WorldCom, Inc.*
    347 B.R. 123 (Bkrtcy. S.D.N.Y. 2006) ...............................................................................16

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ...................................................................................10

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02 Civ. 3288 (DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004) ...................13, 14

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) .................................................................11, 24, 25

*Maley v. Del. Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)..........................................................................passim

*Maywalt v. Parker & Parsley Petroleum Co.*,
    67 F.3d 1072 (2d Cir. 1995)..........................................................................................13

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972)......................................................................................14, 21

*Teachers' Retirement Sys. of La. v. A.C.L.N., Ltd.*,
    No. 01-CV-11814 (MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ...........................22

*Teachers' Retirement Sys. of La. v. A.C.L.N., Ltd.*,
    No. 01-CV-11814 (LAP), 2004 WL 2997957 (S.D.N.Y. Dec. 27, 2004).............................7

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)...........................................................................................11

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982)........................................................................................13, 14

<u>RULES/STATUTES</u>

Rule 23, Fed. R. Civ. P. ..................................................................................................passim

15 U.S.C.A. § 78u-4(a)(7) .................................................................................................12

## I.     INTRODUCTION

Lead Plaintiffs, City of Philadelphia Board of Pensions and Retirement and General Retirement System of the City of Detroit, respectfully submit this memorandum of law in support of their motion for entry of an Order: (a) finally certifying the Settlement Class for settlement purposes; (b) granting final approval of the settlements between Lead Plaintiffs and R&G Financial Corporation ("R&G" or the "Company"), Victor J. Galán, Joseph R. Sandoval, Ramon Prats, Benigno R. Fernandez, Gilberto Rivera-Arreaga, Ileana M. Colon-Carlo (the "Individual Defendants," together with R&G, the "R&G Defendants"), and PricewaterhouseCoopers LLP ("PwC," together with the R&G Defendants, the "Defendants"); and (c) approving Lead Plaintiffs' proposed Plan of Allocation.

Lead Plaintiffs have succeeded in obtaining a recovery for the benefit of the Settlement Class in the total amount of $51,000,000 in cash, on terms provided in the Stipulation and Agreement of Settlement filed with the Court on May 27, 2008 ("Stipulation").[1]  Specifically, Lead Plaintiffs have agreed to settle all claims against the R&G Defendants for a payment of $39 million, and separately reached an agreement with PwC to settle all claims against it for a payment of $12 million.  ¶2.[2]  As set forth in further detail below, and in the accompanying Joint Declaration, through their substantial efforts over the past two and a half years, Lead Plaintiffs have achieved what they respectfully submit to be an outstanding recovery for the benefit of the Settlement Class.

The Settlement represents a particularly excellent result when considered in light of the considerable risks associated with this Action.  ¶¶5,39-40,65-70.  Most significantly, Lead Plaintiffs faced an enormous risk that the R&G Defendants would not be able to satisfy a judgment entered against them at trial or pay a substantial portion of a settlement.  ¶¶5,39.  As described below, the Company had

---

[1]      Unless otherwise defined herein, capitalized terms shall have the meaning ascribed to them in the Stipulation.

[2]      All references to "¶__" herein are to the Joint Declaration of M. Richard Komins and Steven B. Singer in Support of Final Approval of Settlement, Lead Plaintiffs' Proposed Plan of Allocation and An Award to Lead Counsel of Attorneys' Fees and Reimbursement of Litigation Expenses ("Joint Declaration") that Lead Plaintiffs are filing concurrently herewith.  The Joint Declaration provides a detailed description of the history of this litigation, the claims asserted, the investigation and discovery undertaken, the negotiation and substance of the Settlement, and

extremely limited financial capabilities, and the Settlement with it was reached only after Lead Plaintiffs, with the assistance of an outside expert, examined non-public financial information Defendants provided to them and carefully analyzed Defendants' ability to pay.  ¶¶6,32.  In agreeing to settle, Lead Plaintiffs also took into consideration the limits of the R&G Defendants' insurance coverage and the likelihood that the insurance policies might be declared null and void.  ¶¶2,36.  R&G's tenuous and deteriorating financial condition and the lack of available insurance proceeds made the risk of non-collectability of a judgment a central factor in Lead Plaintiffs' decision to settle the Action as to these defendants.

As to the Section 10(b) claim against the auditor, PwC also vigorously disputed the viability of this claim, arguing that Lead Plaintiffs could not establish scienter because, among other reasons, PwC was not alleged to have knowledge of, or to have participated in, the fraudulent accounting at R&G, but was itself defrauded by the Company.  ¶40.  Lead Plaintiffs also faced the substantial risk that, even if they could establish PwC's liability, under the proportionate fault provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a jury would find PwC liable only for a small percentage of those damages.  *Id.*

In addition, Lead Plaintiffs faced a very significant risk that the Class Period would be substantially truncated.  ¶39.  Specifically, Defendants argued that the Class Period should end no later than April 25, 2005, which is the date the Company announced it was restating its financial statements because it had improperly accounted for its mortgage sale transactions and that its financials should no longer be relied upon.  *Id.*  Following this announcement, the Company's stock price dropped approximately 35% in a single day and PwC withdrew its previously issued audit opinions, which contained the allegedly false statements attributable to them.  ¶¶39-40.  Had Defendants succeeded in arguing that the Class Period should end on April 25, 2005 - whether in response to Lead Plaintiffs' motion for class certification, at the summary judgment stage, or at trial - Lead Plaintiffs' damages would have been reduced by approximately 40%.  ¶39.

---

the substantial risks in litigating the claims asserted against the Defendants.  It is an integral part of this submission and is incorporated by reference herein.

Any of the above arguments, if credited by a jury, could have materially impacted the Settlement Class's recovery, and the financial condition of the Company could have further materially impacted the Settlement Class's ability to collect on a judgment against the Company.

Despite all of the risks associated in bringing this Action, Lead Plaintiffs were able to achieve a very favorable recovery for the benefit of the Settlement Class. The Settlement amount represents a substantial percentage of the maximum recoverable damages in this case, which Lead Plaintiffs' damages expert estimated to be approximately $230 million if Lead Plaintiffs prevailed on all claims at trial. ¶39. As set forth below, however, Defendants had put forth a variety of compelling arguments as to why the total recoverable damages should be much less.

In light of the relevant considerations detailed below and under the standards articulated by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), Lead Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate, and should be approved by the Court. Lead Plaintiffs also submit that the Plan of Allocation is fair, reasonable, and adequate as to all Settlement Class Members and should be approved.

## II.    DESCRIPTION OF THE LITIGATION

Beginning on April 27, 2005, various securities class actions were filed on behalf of investors alleging that R&G and certain Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder by fraudulently misstating the Company's financial statements. ¶18. The complaints alleged that Defendants improperly accounted for certain loan sale transactions, which had the effect of artificially inflating the Company's stock price. *Id.* On July 26, 2005, the Court entered an order consolidating the actions, appointing the Lead Plaintiffs as lead plaintiffs in the consolidated Action, approving their selection of Lead Counsel as co-lead counsel, and directing Lead Plaintiffs to file an amended complaint. ¶19.

On February 27, 2007, after conducting an extensive investigation, detailed more fully below, Lead Plaintiffs filed the Amended Complaint, which asserted claims against R&G, the Individual Defendants, and, for the first time, R&G's outside auditor, PwC, under Sections 10(b) and 20(a) of the

Exchange Act and Rule 10b-5.  ¶20.  On May 4, 2007, R&G, the Individual Defendants, and PwC filed motions to dismiss the Amended Complaint, which were fully briefed by July 16, 2007.  ¶21.  On September 7, 2007, the Court entered an order denying R&G's and the Individual Defendants' motions to dismiss, and the Court denied PwC's motion to dismiss on October 19, 2007.  *Id.*

Immediately after the motions to dismiss were denied, Lead Plaintiffs began actively pursuing formal discovery, which included serving the Defendants with requests for the production of documents, meeting and conferring with counsel for the Defendants to negotiate the scope of Defendants' productions, and obtaining and reviewing all relevant documents produced by R&G and PwC in response to the document requests, including all of the documents that R&G had produced to the Securities and Exchange Commission ("SEC") in connection with its investigation of R&G and all of PwC's audit workpapers for its audits of R&G.  ¶¶22-23.

Lead Plaintiffs and R&G, acting on behalf of the Individual Defendants and itself, agreed to a voluntary mediation on October 29 and 30, 2007 with the Honorable Nicholas H. Politan, a retired United States District Court Judge with substantial experience in mediating securities class action litigation.  ¶24. While substantial progress was made at that mediation, no settlement was reached at that time.  *Id.*

On November 2, 2007, R&G issued a restatement of its financial statements for 2002, 2003, and 2004 and PwC issued an auditor's report on those restated financial statements the same day.  ¶25.

Over the following weeks, the parties continued to explore the possibility of settlement and, with the continued assistance of Judge Politan, Lead Plaintiffs and R&G reached an agreement in principle to settle the Action as against the R&G Defendants for $39 million in cash.  ¶26.  This Settlement was reached only after Lead Plaintiffs, with the assistance of an outside expert, reviewed substantial non-public documentation concerning the Company's financial condition and evaluated its ability to pay a judgment entered against it.  ¶¶31-32.  Due to protracted negotiations about the precise terms of the agreement and other developments in the case, Lead Plaintiffs did not enter into a formal Stipulation of Settlement with the R&G Defendants until May 27, 2008.  ¶41.  In connection with this Settlement, R&G received commitments from certain of the Individual Defendants and from R&G's insurance carriers to

make certain financial contributions.  ¶36.  The cash payment of $39 million was deposited into escrow by R&G on June 6, 2008 and has since been earning interest for the benefit of the Settlement Class.  ¶2.

On December 17, 2007, Lead Plaintiffs filed their motion (i) to certify the Action as a class action, (ii) to certify Lead Plaintiffs as Class Representatives, and (iii) to certify Lead Counsel as Class Counsel.  By Stipulation and Order, PwC, the only non-settling Defendant at that time, had until April 19, 2008 to file an opposition to the motion for class certification.  ¶27.

On March 27, 2008, Lead Plaintiffs and PwC, through counsel, voluntarily participated in a mediation with Judge Politan that resulted in Lead Plaintiffs and PwC reaching an agreement in principle to settle the Action as against PwC for $12 million in cash.  ¶28.   The cash payment of $12 million was deposited by PwC into an interest bearing escrow account on June 27, 2008.  ¶2.  This settlement, together with the settlement with the R&G Defendants, resulted in a total recovery of $51 million, plus interest, for the benefit of the Settlement Class.  ¶5.

From the inception of the litigation, Lead Counsel diligently prosecuted this case, including (i) reviewing and analyzing R&G's public disclosures (to the SEC and otherwise) and financial statements, (ii) interviewing numerous witnesses with pertinent knowledge of the facts, (iii) drafting and filing the detailed Amended Complaint, (iv) obtaining and reviewing nearly a million pages of documents relating to the allegations in the Amended Complaint, (v) consulting with experts in accounting and damages, (vi) researching the applicable law with respect to the claims asserted and Defendants' potential defenses thereto, (vii) responding to and successfully arguing each of the five separate motions to dismiss filed by the Defendants, (viii) responding to Defendants' interrogatories and document requests relating to class certification, and (ix) preparing Lead Plaintiffs' mediation statements and reviewing the statements submitted by Defendants.  ¶4.

The Settlement was achieved only after intensive arm's-length negotiations between the parties under the supervision of the mediator, Judge Politan.  During these negotiations, Lead Counsel and counsel for the Defendants presented, among other things, their respective views regarding the merits of the Action including the defenses, the claims, and the damages sought.  At the same time these

negotiations were taking place, Lead Counsel was also vigorously pursuing the Class's claims, both in Court and through the discovery process.  ¶¶30-41.

## III.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS FOR SETTLEMENT PURPOSES

Lead Plaintiffs seek final certification of a Settlement Class of all persons and entities who purchased or otherwise acquired publicly traded securities of R&G between January 21, 2003 and November 2, 2007, inclusive ("Settlement Class Period"),[3] and who were, based on conduct that was or could have been asserted in the Action, allegedly injured thereby.[4]

The Settlement was reached prior to the Court deciding Lead Plaintiffs' motion for class certification.  Therefore, although the Court, through its Preliminary Approval Order of May 28, 2008, properly certified the Settlement Class provisionally based upon the Stipulation and certified Lead Plaintiffs as the Class Representatives, the Court must still determine whether the Settlement Class satisfies the requirements of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure ("Rules").

### A.     The Standards of Rule 23(a) are Satisfied

The general criteria for certification of a class are set forth in Rule 23(a), as follows:

One or more members of a class may sue or be sued as representative parties on behalf of all only if:

    (1)    the class is so numerous that joinder of all members is impracticable;
    (2)    there are questions of law or fact common to the class;
    (3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
    (4)    the representative parties will fairly and adequately protect the interests of the class.

---

[3]     The original class period set forth in the Amended Complaint ended on February 13, 2007.  On November 2, 2007, after Lead Plaintiffs filed the Amended Complaint, R&G filed its restated financials with the SEC, which revealed the full effect of the accounting improprieties and caused a further decline in the Company's stock price. Accordingly, Lead Plaintiffs have extended the Class Period for the purpose of the Settlement to end on November 2, 2007.

[4]     Excluded from the Settlement Class are: (a) Defendants; (b) members of the families of the Individual Defendants; (c) the subsidiaries and affiliates of the Defendants; (d) any person or entity who is a partner, officer, director, or controlling person of R&G (including any of its subsidiaries or affiliates) or of any Defendant; (e) any entity in which any Defendant has a controlling interest; (f) the Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors and assigns of any such excluded party.  The Settlement Class also excludes those persons who timely request exclusion pursuant to the Notice described herein.

Each of these requirements is satisfied here.

>    **1.    The Members of the Settlement Class are so Numerous that Joinder of all Members Is Impracticable**

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members would be "impracticable." "Impracticability means difficulty or inconvenience of joinder [not] ... impossibility of joinder." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999). Moreover, in securities fraud cases "relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Teachers' Ret. Sys. of La. v. ACLN Ltd.*, No. 01 Civ. 11814 (LAP), 2004 WL 2997957, at *3 (S.D.N.Y. Dec. 27, 2004) (internal citations and quotations omitted); *see also In re Deutsche Telekom AG Sec. Litig.*, 229 F. Supp. 2d 277, 280 (S.D.N.Y. 2002) ("Class certification is frequently appropriate in securities fraud cases involving a large number of shares traded publicly in an established market.").

This requirement is satisfied here. As detailed in the Notice, during the Settlement Class Period, there were approximately 29.6 million shares of R&G common stock issued and outstanding and an average of 919,529 shares were traded each week. The Notice also states that Lead Plaintiffs' damages expert estimates that approximately 58.7 million shares of R&G common stock may have been affected by the conduct at issue in the Action. As of August 19, 2008, Heffler, Radetich & Saitta LLP ("HR&S"), the Claims Administrator for the Settlement, had mailed a total of 27,095 Notices and Proof of Claims to potential Settlement Class Members or their nominees. ¶¶ 10,43. Accordingly, the Settlement Class is extremely large and the numerosity requirement of Rule 23(a)(1) is readily satisfied.

>    **2.    There are Numerous Questions of Law or Fact Common to the Members of the Settlement Class**

Rule 23(a)(2) requires that, in order for an action to be properly maintained as a class action, there must be questions of law or fact common to the Class. "[T]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *In re Global Crossing Sec. and ERISA Litig.,* 225 F.R.D. 436, 451 (S.D.N.Y. 2004)

This commonality requirement "has been applied permissively" by the courts in securities fraud actions. *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855 (RMB), 2003 WL 22077464, at *3 (S.D.N.Y. Sept. 8, 2003) (internal quotations omitted); *see also In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007).

The "commonality" requirement is plainly satisfied here. The claims of all Settlement Class members arise out of the same nucleus of operative facts and are based upon the following common legal issues: (a) whether Defendants violated the federal securities laws; (b) whether the SEC filings, press releases, and other public statements contained material misstatements or omitted to state material information; (c) whether and to what extent the Company's financial statements failed to comply with Generally Accepted Accounting Principles ("GAAP"); (d) whether and to what extent PwC's audits of R&G violated Generally Accepted Auditing Standards ("GAAS"); (e) whether and to what extent the market prices of the Company's securities were artificially inflated due to Defendants' non-disclosures and/or misrepresentations; (f) whether the Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts; (g) whether the Individual Defendants are controlling persons of the Company; (h) whether reliance may be presumed pursuant to the fraud-on-the-market rule; and (i) whether the members of the Class have sustained damages as a result of Defendants' misconduct and, if so, the proper measure thereof. *See* Amended Complaint at ¶25.

### 3.    Lead Plaintiffs' Claims Are Typical of the Claims of the Settlement Class

Rule 23(a)(3) requires that "the claims ... of the representative parties [be] typical of the claims ... of the class." Typicality is satisfied where the "claims of representative plaintiffs arise from the same course of conduct that gives rise to claims of the other class members, where the claims are based on the same legal theory, and where the class members have allegedly been injured by the same course of conduct as that which allegedly injured the proposed representatives." *In re Oxford Health Plans*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000).

The typicality requirement is plainly satisfied here. The claims asserted by the Lead Plaintiffs are based upon the same allegedly false and misleading statements contained in, and material facts omitted

from, the SEC filings, press releases, and other public statements; and all assert the same legal theories. Furthermore, the acts allegedly committed by Defendants affected the entire Settlement Class in the same way -- by artificially inflating the market prices of R&G securities and causing the Settlement Class members' financial losses as a result.

### 4. Lead Plaintiffs Have Fairly and Adequately Protected the Interests of the Settlement Class

The final Rule 23(a) prerequisite is "adequacy." Rule 23(a)(4) requires the conclusion that "the representative parties will fairly and adequately protect the interests of the class." The adequacy requirement is met if it appears that (a) the plaintiff's interests are not antagonistic to those of other members of the class they seek to represent, and (b) the plaintiff's attorneys are qualified, experienced and generally able to the conduct litigation. *See In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir. 1992)*; In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 123 (S.D.N.Y. 1997).

Here, Lead Plaintiffs' interests are clearly aligned with those of the Settlement Class, since they, like other Settlement Class members, were damaged as a result of the Defendants' alleged conduct. *See Global Crossing,* 225 F.R.D. at 453. Moreover, both Lead Plaintiffs and the absent Settlement Class members have precisely the same interest in proving that Defendants violated the securities laws and in achieving the maximum recovery possible for the Settlement Class. *See In re Chase Manhattan Corp. Sec. Litig.*, No. 90 Civ. 6092 (LJF), 1992 WL 110743, at *2 (S.D.N.Y. May 13, 1992).

In addition, Lead Counsel are experienced class action litigators capable "of competently and vigorously prosecuting the litigation." *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 165 (S.D.N.Y. 2000). Lead Counsel, under the supervision of Lead Plaintiffs, have worked diligently and vigorously in the pursuit of the Class's claims in order to maximize the recovery achieved for the benefit of the Settlement Class. Among other things, Lead Counsel conducted an extensive investigation of public and non-public sources of information relating to the claims and the underlying events and transactions alleged in the Amended Complaint, reviewed and analyzed the evidence adduced during their investigation, and researched the applicable law with respect to the claims alleged and the potential

defense thereto; undertook extensive arms' length settlement negotiations under the supervision of Lead

Plaintiffs mediated by a highly-respected former judicial officer; documented appropriately the

agreements reached with the Defendants in a Stipulation of Settlement; accurately summarized the

Settlement and its components in the Notice presented to the Court for transmittal to all potential

Settlement Class Members; and, with the assistance of an outside consultant, devised a proposed Plan of

Allocation that will ensure that all Settlement Class Members who file claims are treated fairly and

reasonably.  ¶¶46-57.

> **B.**      **The Requirements of Rule 23(b)(3) Have Been Met**

In addition to meeting the prerequisites of Rule 23(a), a class action must satisfy the requirements

of at least one of the subdivisions of Rule 23(b).  In this case, the requirements of Rule 23(b)(3) are

satisfied.  That Rule provides:

> (b) A class action may be maintained if Rule 23(a) is satisfied and if: ... (3) the court
> finds that the questions of law or fact common to class members predominate over any
> questions affecting only individual members, and that a class action is superior to other
> available methods for fairly and efficiently adjudicating the controversy. …

The Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging

... securities fraud."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (citing Fed. R. Civ. P. 23

Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 385); *In re WorldCom, Inc. Sec.*

*Litig.*, 219 F.R.D. 267, 288 (S.D.N.Y. 2003); *Cromer Finance Ltd. v. Berger*, 205 F.R.D. 113, 127

(S.D.N.Y. 2001).  "Class-wide issues predominate if resolution of some of the legal or factual questions

that qualify each class member's case as a genuine controversy can be achieved through generalized

proof, and if these particular issues are more substantial than the issues subject only to individualized

proof."  *In re Livent, Inc. Noteholders Sec. Litig.*, 210 F.R.D. 512, 517 (S.D.N.Y. 2002).  Here, the

predominance test is plainly met.  All claims of Lead Plaintiffs and other Settlement Class members, and

all defenses that the Defendants might have raised in response thereto, are applicable to the entire

Settlement Class.  Defendants' liabilities for the alleged false and misleading statements and omissions in

this case would have either been established, or defeated, on a class-wide basis.  As a result, Lead

Plaintiffs have met the predominance requirement because common questions of law and fact are present and predominate over any individual issues that might have arisen in this Action.

Lead Plaintiffs have also has met the superiority requirement.  When considering a proposed settlement class for purposes of superiority, the court "need not inquire whether the case, if tried, would present intractable management problems … for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.  Here, maintenance of the Action as a class action is superior to other methods.  Individual Settlement Class members have not shown to this point an interest in controlling this Action.  Indeed, as of the date of this filing, no objections to the Settlement have been filed and only three exclusions have been received.  ¶45.  Further, allowing this case to proceed as a class action will avoid potentially duplicative litigation, potentially inconsistent rulings, and save judicial resources.  "Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would be neither 'fair' nor an 'adjudication' of their claims."  *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 527 (S.D.N.Y. 1996).

## IV.     THE NOTICE OF SETTLEMENT SATISFIES DUE PROCESS REQUIREMENTS AND IS REASONABLE

Rule 23(c)(2) requires "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974) (class notice designed to fulfill due process requirements); *In re NASDAQ Market-Makers Antitrust Litig.,* No. 94 Civ. 3996 (RWS), 1999 WL 395407, at *2 n. 3 (S.D.N.Y. June 15, 1999).  The standard for measuring the adequacy of a class action settlement notice is reasonableness. *See In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 340 (S.D.N.Y. 2005); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 113 (2d Cir. 2005).  "There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings."  *Id*. at 114 (citation omitted). "Notice is adequate if it may be understood by the average class member."  *Id*. (citation omitted).

Here, in accordance with the Court's Preliminary Approval Order, starting on June 18, 2008, HR&S caused the Notice, as approved by the Court, to be mailed by first class mail to potential Settlement Class members.  ¶¶ 43-44.  The Notice contains a thorough description of the Settlement, the Plan of Allocation, and Settlement Class Members' rights to participate in and object to the Settlement, or exclude themselves from the Settlement Class.[5]  *Id.*  On July 2, 2008, the approved Summary Notice was published in the national edition of *The Wall Street Journal* and released over the *PR Newswire*.  ¶44. Information regarding the Settlement, including downloadable copies of the Notice and Claim Form, was also posted on HR&S's website (*www.hrsclaimsadministration.com/cases/rng*) as well as on Lead Counsel's websites (*www.blbglaw.com and www.barrack.com*).  ¶¶ 44,56.

The notice program, which combined an individual, mailed Notice to all potential Settlement Class members who could be reasonably identified as well as to custodian holders, and a Summary Notice published in the nation's pre-eminent national business publication and over the internet, contained all information required by § 21D(a)(7) of the PSLRA, and is adequate to meet the due process and Rule 23(c)(2) and (e) requirements for providing notice to the Settlement Class.

**V.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE**

    **A.    The Standard for Approval of a Class Action Settlement**

"As a general policy matter, federal courts favor settlement, especially in complex and large-scale disputes, so as to encourage compromise and conserve judicial and private resources."  *Global Crossing.,*

---

[5]    As set forth in the Joint Declaration, the final Plan of Allocation includes a specific allocation plan for R&G's Noncumulative Perpetual Monthly Income Preferred Stock Series A, B, C and D (the "Preferred Shares"), which was inadvertently omitted from the Plan included in the Notice.  Joint Decl. at ¶¶ 53-57.  Lead Plaintiffs respectfully submit that the failure to include a specific plan of allocation for the Preferred Shares in the Notice should not delay final approval of the Plan or the Settlement.  Lead Plaintiffs note that both the Preliminary Approval Order and the Notice informed Class members that the Court had the right to modify or change the Plan of Allocation without further notice to the Class, and the Notice further advised Class members to periodically check the websites set up to provide information about this Settlement.  ¶54.  Moreover, on August 29, 2008, Lead Plaintiffs issued a press release informing Class members of this addition to the Plan, and also posted that new Plan on the settlement websites maintained by Lead Counsel and the Claims Administrator.  ¶56.  Given these facts, and the fact that the Plan for the Preferred Shares closely follows the Plan for the common stock (and that the Preferred Shares constitute an extremely small percentage of the Class), the Plan should be approved by the Court.  Further, in light of the omission, we ask that the Court extend the deadline for filing a claim form by one month, from September 26, 2008 to October 24, 2006, to give purchasers of the Preferred Shares additional time to participate in the Settlement.

225 F.R.D. at 455; *see also In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *3 (S.D.N.Y. July 27, 2007) ("Settlement approval is within the Court's discretion, which should be exercised in light of the general judicial policy favoring settlement."); *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982). In evaluating a proposed class action settlement, a court must determine whether the settlement, taken as a whole, is fair, reasonable, and adequate and was not the product of collusion. *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 473 (S.D.N.Y. 1998); *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995). A court determines a settlement's fairness by examining the negotiating process leading up to the settlement as well as the substantive terms of the settlement compared to the likely result of a trial. *See, e.g., In re WorldCom Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 WL 2591402, at *10 (S.D.N.Y. Nov. 12, 2004); *In re NASDAQ*, 187 F.R.D. at 473 (the court's "primary concern" is with settlement's substantive terms).

There is a "strong presumption" that a securities class action settlement is "fair, reasonable and adequate if … it was the product of arm's-length negotiations conducted by capable counsel, well-experienced in class action litigation arising under the federal securities laws." *EVCI*, 2007 WL 2230177, at *4; *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999). Moreover, under the PSLRA, a settlement reached under the supervision of an appropriately selected lead plaintiff is entitled to an even greater presumption of reasonableness. *See Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 63-64 (D. Mass. 1996) ("'Institutions with large stakes in class action share much the same interests as the plaintiff class generally; thus, courts could be more confident settlements negotiated under the supervision of institutional plaintiffs were fair and reasonable…'") (quoting Senate Report No. 104-98, 104th Congress, reprinted in 1995 U.S.C.C.A.N. 679, 690). Here, of course, not only were the separately negotiated settlements with the R&G Defendants and PwC reached through arms' length negotiations among experienced counsel, they were also approved by sophisticated Lead Plaintiffs chosen pursuant to the "most adequate plaintiff" presumptions of the PSLRA. ¶¶ 5,30-41. Additionally, the negotiation process was facilitated by the Honorable Nicholas H. Politan, a highly experienced former federal court judge who served as the settlement mediator in this case. ¶¶ 33,38.

In *Grinnell*, the Second Circuit held that the following were factors to be considered in evaluating the substantive fairness of a class action settlement:

> (1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d at 463; *see also WorldCom*, 2004 WL 2591402, at *10; *Sumitomo*, 189 F.R.D. at 280.

In applying the *Grinnell* factors, a court should neither substitute its judgment for that of the parties who negotiated the settlement nor conduct a mini-trial of the merits. *Weinberger*, 698 F.2d at 74; *Newman v. Stein*, 464 F.2d 689, 691-92 (2d Cir. 1972) (since "[t]he very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation, the court must not turn the settlement hearing into a trial or a rehearsal for the trial"); *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993). In short, this Court is asked to determine that the Settlement is within a range that reasonable and experienced attorneys, and sophisticated institutional Lead Plaintiffs, could accept, considering all relevant risks, facts, and circumstances. *See Weinberger*, 698 F.2d at 74.

Lead Plaintiffs respectfully submit that the proposed Settlement is eminently fair, reasonable, and adequate when measured under the foregoing criteria. The separately negotiated settlements with the R&G Defendants and PwC were reached only after capable counsel, with extensive experience in complex securities litigation, had fully explored the substantial risks associated with continued litigation of the Action and the strengths and weaknesses of their respective positions and had engaged in lengthy arm's length settlement negotiations with the Defendants' counsel. The Settlement, whether considered as a whole or as separate components, represents an excellent result for the Settlement Class and should be approved by this Court.

**B.    The Settlement is Substantively Fair Under *Grinnell***

**1.    The Complexity, Expense and Likely Duration of the Litigation**

The "complexity, expense and likely duration of the litigation" are factors that the Court should consider in evaluating a proposed settlement for approval. *Grinnell*, 495 F.2d at 463; *In re Drexel Burnham Lambert Group Inc.*, 130 B.R. 910, 927 (S.D.N.Y. 1991). In so doing, courts have long recognized that securities class actions are particularly "difficult and notoriously uncertain" as to both liability damages. *See Sumitomo*, 189 F.R.D. at 281. The same is true here.

While Defendants' motions to dismiss have already been decided, a number of unresolved procedural issues, such as the certification of a class for trial, would have to be addressed prior to trial on the merits. In addition, any summary judgment motions filed by the parties would have to be briefed and decided by the Court. The resolution of each of these issues would require an additional investment of time and expense on behalf of each of the parties.

The complexity of the substantive issues in this Action also weighs in favor of settlement. At trial, Lead Plaintiffs would have to establish each of the elements for the claims asserted in the Amended Complaint under Sections 10(b) and 20(a) of the Exchange Act and Rule 10-5. With respect to the Section 10(b) claim, Lead Plaintiffs would have the burden of proof with respect to proving the Defendants' scienter and damages – which, as explained in more detail below, carried significant risks – in addition to establishing the false and misleading nature of Defendants' statements, the materiality of the statements made and omissions alleged, and loss causation. Moreover, this case involved accounting and financial issues that required a thorough understanding of the GAAP and GAAS provisions at issue, and required extensive consultation with forensic accounting and auditing experts.

Furthermore, absent the Settlement, there would have been significant additional necessary resources and costs expended to prosecute the claims against the Defendants. Trial on theses issues would be both lengthy and costly, and would require expert testimony, further adding to the expense and duration of the Action. *See In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 318 (3d Cir. 1998) (settlement favored where "trial of this class action would be a long, arduous process requiring

15

great expenditures of time and money on behalf of both the parties and the court").  Moreover, even if the

Settlement Class were able to recover a judgment at trial, there is always additional delay caused by not

only the trial, but by the inevitable appeals of any judgments.  The Settlement provides a benefit for the

Settlement Class without the expense and delay of further litigation.

### 2.    The Reaction of the Settlement Class to the Settlement

The reaction of the Settlement Class to the Settlement is a further factor favoring its approval by

the Court.  *See Grinnell*, 495 F.2d at 462.  While the deadline for filing objections is September 2, 2008,

as of the date of the present filing, Lead Counsel are not aware of any objections with respect to the

Settlement, and the Claims Administrator has received only three requests for exclusion from the

Settlement Class, out of the more than 27,095 Notices sent to potential Settlement Class members or their

nominees.  ¶10.  Thus, Lead Plaintiffs respectfully submit that the positive reaction of the Settlement

Class to date supports approval of the Settlement.  *See Maley v. Del. Global Techs. Corp.*, 186 F. Supp.

2d 358, 361 (S.D.N.Y. 2002) ("It is well-settled that the reaction of the class to the settlement is perhaps

the most significant factor to be weighed in considering its adequacy.").

### 3.    The Stage of the Proceedings and Amount of Discovery Completed

"[T]he stage of the proceedings and the amount of discovery completed" are other factors to be

considered in determining the fairness, reasonableness and adequacy of a settlement.  *Grinnell*, 495 F.2d

at 463.  "[F]ormal discovery is not a prerequisite; the question is whether the parties had adequate

information about their claims."  *Global Crossing*, 225 F.R.D. at 458; *see also In re WorldCom, Inc.*, 347

B.R. 123, 145 (Bkrtcy. S.D.N.Y. 2006) ("This factor is attuned to the parties' knowledge and awareness

of the relative strength or weakness of each party's respective arguments and positions.").  This factor is

easily met in this case.

The Settlement was reached after two and a half years of hard fought litigation, including the full

briefing and argument of five separate motions to dismiss, comprehensive document discovery, and

extensive consultation with experts retained by Lead Plaintiffs in the fields of forensic accounting and

auditing and damages.  Given that the Company was and remains in poor financial condition, the decision

to enter into a settlement with it at this stage of the litigation provides a concrete benefit to the Settlement Class, as well as to the Company and its shareholders. This Court's reasoning in approving an award of attorneys' fee in *In re Versatility, Inc. Securities Litigation* applies equally here:

> ... This is one of those cases in which, had it gone on long enough, the plaintiffs might have well wound up with nothing but unsecured claims in the Bankruptcy Court, because Versatility is in bad financial shape, or it is at least not in great financial shape, and the settlement may save the company from going into bankruptcy. Therefore, from the company's point of view, it is a good settlement and reflects, I think, the best interests of the shareholders and the intelligence of the lawyers involved. No one profits when we put a corporation into bankruptcy. Jobs are lost, companies are out of business.

No. 98 Civ. 1676 (JES) (Nov. 13, 1998) at 9-10.

As set forth in the Joint Declaration, prior to entering into the Settlement, Lead Counsel had extensively investigated the relevant facts and transactions alleged in the Amended Complaint, reviewed and analyzed nearly a million pages of documents produced by PwC and R&G relating to the transactions and accounting decisions at issue in the case, and consulted with their experts to get an objective evaluation of the strength and weakness of their claims and the potential defenses thereto. ¶4. Lead Counsel therefore had the requisite information to make an informed decision about the relative benefits of litigating or settling the Action and "developed an informed basis from which to negotiate a reasonable compromise." *Global Crossing*, 225 F.R.D. at 458; *see also Maley*, 186 F. Supp. 2d at 363-64.

### 4.    The Risks of Establishing Liability and Damages and in Maintaining the Class Action Through Trial

*Grinnell* also holds that, in assessing the fairness, reasonableness, and adequacy of a settlement, courts should consider the "risks of establishing liability," "the risks of establishing damages," and "the risks of maintaining the class action through the trial." 495 F.2d at 463. In so doing, the Court is not called on to adjudicate disputed issues or decide unsettled questions, but instead, should "assess the risks of litigation against the certainty of recovery under the proposed settlement." *Global Crossing*, 225 F.R.D. at 459.

Here, there are certain undeniable risks that had to be considered by Lead Plaintiffs in assessing the sufficiency of the Settlement. In particular, Lead Plaintiffs faced a very substantial risk in establishing

PwC's scienter. PwC argued that Lead Plaintiffs could not establish the requisite fraudulent intent or reckless disregard because (a) it had no knowledge of, and did not participate in, the accounting fraud at R&G, and (b) the accounting fraud was actively concealed from PwC by the Company's senior executives. While Lead Plaintiffs believe they would have been able to establish scienter as to PwC, they faced a real risk that a jury would find that PwC did not act with the requisite intent to defraud. [6] ¶7.

Lead Plaintiffs also faced risks in proving damages. As an initial matter, with respect to the fraud claim asserted against PwC, Lead Plaintiffs faced a significant risk that a jury would conclude that PwC was liable (if at all) for only a small percentage of the Class's damages. Indeed, given the proportionate fault provisions of the PSLRA, under which a defendant may be obligated to pay only for that portion of damages for which that defendant is held responsible, even if Lead Plaintiffs could establish PwC's liability, it was likely that a jury would attribute only a small proportion of liability to it. [7] ¶7.

Moreover, in securities cases, calculation of damages is a "complicated and uncertain process, typically involving conflicting expert opinions" about the difference between the purchase price and the stock's "true" value absent the alleged fraud. *Maley*, 186 F. Supp. 2d at 365. Defendants' experts would have presented sophisticated analyses and methodologies for calculating damages as they relate to the statements of R&G and the audit opinions issued by PwC, and a wide divergence would exist between the opinions of these experts and those put forth by Lead Plaintiffs. It is difficult to predict which testimony or methodology might be accepted by the jury or which might simply be rejected as inherently speculative and unreliable. *See In re Independent Energy Holdings PLC Sec. Litig.,* No. 00 Civ. 6689 (SAS), 2003 WL 22244676, at *3 (S.D.N.Y. Sept. 29, 2003) ("[P]roof of damages in securities cases is always difficult and invariably requires expert testimony which may, or may not be, accepted by a jury."); *In re Am. Bank*

---

[6]    R&G and the Individual Defendants also argued that they lacked the requisite scienter since, among other things, they were entitled to, and did, rely in good faith on the opinions they received PwC and outside counsel, and did not sell *any* stock during the Class Period. While Plaintiffs believe that they could establish these Defendants' scienter (or, with respect to the Individual Defendants against whom only Section 20(a) claims were asserted, that they did not satisfy their good faith defense to control person liability), Lead Plaintiffs cannot dismiss the possibility that a reasonable jury could conclude that these Defendants did not act with intent to defraud.

[7]    Each of the Defendants also argued that Lead Plaintiffs would not be able to show that their conduct caused

*Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001) ("Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount of Plaintiffs' losses.").  Thus, Lead Plaintiffs faced a real risk that a jury would have found the damages caused by the alleged misconduct to be much smaller than they claimed.

Finally, Lead Plaintiffs faced a significant risk that the Class Period would end much earlier than the date alleged in the Amended Complaint.  Defendants vigorously argued that the Class Period should end no later than April 25, 2005 -- the date R&G announced it was restating its financial statements because it had improperly accounted for its mortgage sale transactions and that its financials should no longer be relied upon -- because Lead Plaintiffs could not show reasonable reliance on R&G's financial statements after that date.  ¶¶8,39.  While Lead Plaintiffs believe they had strong arguments to counter this point, including that the Company did not disclose the full extent of the restatement until much later, Lead Plaintiffs cannot dispute that the April 25, 2005 announcement was highly material, and they recognize there was a real risk that a jury could determine that the Class Period appropriately ended on that date.  *Id*.  The success of this argument would have substantially reduced the size of the Settlement Class and affected the claims and damages at issue in the Action dramatically.  *Id*.

Furthermore, while Lead Plaintiffs believe that each of the class action elements are met and that they would have been able to maintain the Action as a class action through trial, the Settlement was reached prior to the Defendants responding to, and the Court deciding, the motion for class certification.  Even if the motion were granted, however, no decision certifying a class is immune from a possible reversal on appeal or reconsideration at a later time, including based on issues that may develop at trial itself.  *See, e.g., In re NASDAQ.*, 187 F.R.D. at 476-77 (decertification can occur if management problems arise during litigation and could deprive class of any recovery); *Doe v. Karadzic,* 192 F.R.D. 133, 136 (S.D.N.Y. 2000) (decertifying class and stating that courts are required to reassess their class rulings as the case develops).

---

the losses suffered by the Class.

These risks to establishing liability, damages, and maintaining the class action through trial, while significant, were obviated by reaching the Settlement at a relatively early phase in the litigation. Moreover, when viewed against the substantial and certain benefits that the Settlement will provide to the Settlement Class, these risks favor approval of the Settlement.

### 5. Collectability and the Ability of Defendants to Withstand a Greater Judgment

The *most significant risk* to continued prosecution of the Action was the threat of non-collectability of any judgment obtained by Lead Plaintiffs at trial.  ¶5.  Following the denial of Defendants' motions to dismiss, Lead Counsel became aware that the Company's financial condition was deteriorating rapidly and that its ability to pay, or significantly contribute to, a judgment larger than the settlement amount was extremely doubtful.  *Id*. For example, during the settlement negotiations and at the time the settlement with the R&G Defendants was reached: (a) the Company had been delisted from the New York Stock Exchange for nearly a year for failure to make timely filings of its financial statements; (b) the Company had not filed any financial statements for two years and had not yet filed the restatement of its 2002, 2003 and 2004 financials; (c) the Company's stock was trading at roughly $1.00 per share on the "pink sheets"; (d) the Company had virtually no cash; (e) the mounting mortgage and credit crisis had further eroded the Company's profitability as a mortgage lender and the Company's financial condition was rapidly deteriorating; and (f) the Company's insurance carriers had denied coverage because of the alleged fraud and had even filed a declaratory judgment action against R&G.  *Id.*

In light of the foregoing, Lead Counsel obtained detailed, confidential non-public financial information about the Company and retained a well-recognized expert on banking and finance, who is a prominent professor at Temple University's Business School, to review this information and advise Lead Plaintiffs as to R&G's ability to pay.  Lead Plaintiffs and their banking expert, as part of the mediation process with Defendants and Judge Politan, considered R&G's present and projected financial condition, as well as the amount of available insurance, in working to maximize the recovery that could be obtained for the Settlement Class.  ¶¶32-34.

20

It is clear that even if Lead Plaintiffs were to obtain a greater judgment at trial, the Company and the Individual Defendants could not have satisfied that judgment, or even paid a substantial amount of a larger settlement.  Indeed, given the amount of the Settlement Class's damages as calculated by Lead Plaintiffs' damages expert, any judgment for a substantial portion of those damages would likely have resulted in the Company's bankruptcy.  ¶39.  "The risk that a successful prosecution will result in the bankruptcy of the defendant strongly weighs in favor of approval of a settlement."  *EVCI*, 2007 WL 2230177, at *8; *see also Grinnell*, 356 F. Supp. at 1389 (the "prospect of a bankrupt judgment debtor at the end of the road does not satisfy anyone involved in the use of class action procedures").

Despite the dire financial condition of the Company during the settlement negotiations and at the time of the Settlement, Lead Counsel was able to achieve a settlement with the R&G Defendants for $39 million, including a material contribution from defendant Galán, R&G's Chairman and former Chief Executive Officer.  The Company paid a material portion of its cash to settle the claims against it, and was able to pay only upon the sale of a significant asset, R&G Crown Bank, the Company's Florida banking subsidiary.  Lead Plaintiffs respectfully submit that in light of the foregoing, the fact that they recovered $39 million from the R&G Defendants is extraordinary.[8]

> **6.    The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and in Light of All Risks of Litigation**

The final two *Grinnell* factors - the reasonableness of the settlement in light of the best possible recovery and the risks of litigation - also weigh in favor of approval of the Settlement.  As this Court has explained, there is "a range of reasonableness with respect to a settlement" that "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."  *Newman*, 464 F.2d at 693.  A fairness determination turns not on a "mathematical equation yielding a particularized sum ... but rather ... [on] the strengths and weaknesses of the plaintiff's case."  *In re PaineWebber*, 171 F.R.D. at 130.  Here, given the substantial risks to collectability of a larger

---

[8]    With the exception of Defendant Galán, the Individual Defendants did not have substantial assets to contribute to a settlement.  Moreover, as Lead Counsel became aware during the settlement negotiations, much of defendant Galan's money was tied up in the Company's stock.

judgment, the $51,000,000 Settlement is remarkable and falls well within the requisite "range of reasonableness."

In assessing the reasonableness of a settlement amount, the legal and practical obstacles to obtaining a larger recovery at trial must be weighed against the certainty of the proposed settlement. *See Global Crossing,* 225 F.R.D. at 461. As detailed above, the Company and Individual Defendants clearly could not satisfy a larger judgment here. In cases like this, the prompt, guaranteed payment of the settlement money now increases the settlement's value in comparison to "some speculative payment of a hypothetically larger amount years down the road." *Teachers' Retirement Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814 (MP), 2004 WL 1087261, at *5 (S.D.N.Y. May 14, 2004); *see also Global Crossing,* 225 F.R.D. at 460-61; *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1396, 1405 (E.D.N.Y. 1985).

Furthermore, the Settlement represents a substantial percentage of the Class's maximum recoverable damages, which Lead Plaintiffs' damages expert estimated to be approximately $230 million if Lead Plaintiffs prevailed on all of their claims. ¶39. As set forth above, however, Defendants put forth persuasive arguments that damages were much less than what Lead Plaintiffs had proposed. Even if the amount of "potential damages" is greater than the amount of a proposed settlement, however, this does not preclude approval of the lesser settlement. *See Global Crossing,* 225 F.R.D. at 460-61 (The "settlement amount's ratio to the maximum potential recovery need not be the sole, or even the dominant, consideration when assessing the settlement's fairness."); *Grinnell*, 495 F.2d at 455 ("[T]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.").

The reasonableness of the settlement in light of the risks of litigation also weighs in favor of approval of the Settlement. As discussed above, while Lead Plaintiffs believe that they would be able to establish liability and damages as to each of their claims, such a victory was no sure thing. With respect to the claim against PwC, Lead Plaintiffs recognized this claim carried with it a strong possibility that a jury would not find scienter. As noted above, Lead Plaintiffs also recognized that the Class faced the possibility that class certification with respect to certain of their claims may not have been granted.

Moreover, even if Lead Plaintiffs were successful at trial and obtained a larger judgment, the litigation would likely be lengthy and costly, and there is significant doubt that any judgment in their favor could be collected. Thus, when the benefits of the immediate guaranteed recovery are weighed against the risks of continued litigation and potential for recovery after trial, it is clear that approval of the Settlement is warranted here.

Therefore, given the obstacles and uncertainties attendant to this Action, Lead Plaintiffs submit that the Settlement is well within the range of reasonableness, and should be approved.

### C.    The Proposed Settlement Is The Product Of Informed Arm's-Length Negotiations And Is Presumptively Fair

"In appraising the fairness of a proposed settlement, the view of experienced counsel favoring the settlement is 'entitled to great weight'. … There is thus a strong initial presumption that the compromise as negotiated herein under the [c]ourt's supervision is fair and reasonable." *In re Michael Milken*, 150 F.R.D. at 54; *see also In re Union Carbide Corp. Consumer Prod. Bus. Sec. Litig.,* 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989). As the court noted in approving the settlement in *Sumitomo*, "so long as the integrity of the arm's-length negotiation process is preserved … *a strong initial presumption of fairness attaches to the proposed settlement*.'" 189 F.R.D. at 280-81 (emphasis in original) (quoting *In re PaineWebber*, 171 F.R.D. at 125).

The Settlement here is entitled to this "presumption of fairness." As discussed above, the Settlement was negotiated at arm's-length between Lead Counsel and counsel for the Defendants and was mediated by Judge Politan. Where, as here, "[t]he process by which the parties reached the Proposed Settlement[] was arm's-length and hard fought by skilled advocates," the Settlement is deserving of the Court's approval. *In re NASDAQ*, 187 F.R.D. at 474. Accordingly, Lead Plaintiffs submit that the Settlement be approved by this Court.

## VI.    THE PROPOSED PLAN OF ALLOCATION IS FAIR AND REASONABLE

Approval of a plan of allocation in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution must be fair, reasonable, and

adequate. *WorldCom,* 388 F. Supp. 2d at 344. Moreover, when formulated by competent and experienced class counsel, an allocation plan need have only a "reasonable, rational basis." *Maley*, 186 F. Supp. 2d at 367; *see also Am. Bank Note*, 127 F. Supp. 2d at 429-30; *In re NASDAQ Market-Makers Antitrust Litig.,* No. 94 Civ. 3996 (RWS), 2000 WL 37992, at *2 (S.D.N.Y. Jan. 18, 2000). In *Maley,* Judge McMahon wrote: "The proposed Plan of Allocation, which was devised by experienced plaintiffs' counsel who are familiar with the relative strengths and weaknesses of the potential claims of Class members, satisfied the same standards of fairness, reasonableness, and adequacy that apply to the overall settlement." 186 F. Supp. 2d at 367. The same reasoning applies here.

The final Plan of Allocation provides that the Net Settlement Fund will be distributed to Settlement Class members who submit a timely, valid Claim Form. *See* Amended Plan of Allocation at Exh. 1 to Joint Declaration. The Plan of Allocation is designed to achieve an equitable distribution of the Net Settlement Fund. Lead Counsel worked closely with the Lead Plaintiffs' damages expert in establishing the Plan of Allocation, and believe that the Plan of Allocation, as amended, is a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members, including to holders of R&G common stock and R&G's Noncumulative Perpetual Monthly Income Preferred Stock – Series A, B, C and D (the "Preferred Shares"), whose respective losses are treated equally under the Plan. *See, e.g.*, Declaration of Michael A. Marek in Support of Settlement, attached as Exhibit 5 to the Joint Declaration.

The plan of allocation for R&G's common stock (*see* pages 1 and 2 of Exhibit 1 to the Joint Decl.) calculates the recognized loss amount based on the level of alleged artificial inflation in the price of R&G's common stock at the time of purchase, as determined by Lead Plaintiffs' damages expert. Marek Decl. at ¶¶ 4-11. For the plan of allocation for the Preferred Shares (*see* page 3 of Exhibit 1 to the Joint Decl.), Lead Plaintiffs' expert estimated the potential per share damages sustained by purchasers of the Preferred Shares based upon analysis of available actual trading data of those shares on or about the dates on which there were public disclosures that revealed or described the alleged misrepresentations or their effects. *Id.* at ¶ 12. These methods of allocating settlement proceeds based on the strengths and

weaknesses of various claims and the timing of the purchases and sales of the securities at issue has been repeatedly accepted by the Courts. *See, e.g., WorldCom*, 388 F. Supp. 2d at 348; *In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2005); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y. 1992); *In re Charter Commc'ns, Inc. Sec. Litig.*, No 4:02-CV-1186 (CAS), 2005 WL 4045741, at *2 (E.D. Mo. June 30, 2005).

Lead Plaintiffs believe that the Plan of Allocation as amended is the most fair and reasonable way to apportion the Settlement Fund given the different risks involved. Moreover, as noted previously, no Settlement Class member has objected to the Plan of Allocation, which further supports approval of the proposed Plan by the Court.

## VII.    CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court enter an Order and Final Judgment certifying the Settlement Class for settlement purposes and approving the Settlement as fair, reasonable, and adequate and the Plan of Allocation as fair and reasonable.

Dated:  August 29, 2008                              Respectfully submitted,

By:    /s/  M. Richard Komins
       Leonard Barrack
       M. Richard Komins (admitted pro hac vice)
       Jeffrey A. Barrack
       Lisa M. Lamb
       BARRACK RODOS & BACINE
       3300 Two Commerce Square
       2001 Market Street
       Philadelphia, PA 19103
       Tel.: (215) 963-0600

By:    /s/ Steven B. Singer
       Max W. Berger (MB-5010)
       Steven B. Singer (SS-5212)
       Eric T. Kanefsky (EK-3511)
       BERNSTEIN LITOWITZ BERGER &
          GROSSMANN LLP
       1285 Avenue of the Americas
       New York, NY 10019
       Tel.: (212) 554-1400

       *Co-Lead Counsel for Lead Plaintiffs and the Proposed Settlement Class*